TINSLEY, Appellant, v. JEMISON, Respondent. (Supreme Court, Appellate Division, Second Department. December 8, 1896.) Action by Thomas Tinsley against Elbert S. Jemison for rescission of a contract for fraud. Frederic A. Ward, for appellant. John L. Hill, for respondent.

BRADLEY, J. The plaintiff by this action seeks to rescind an agreement made between him and the defendant April 14, 1888, and to have restoration reciprocally made of whatever was received by either from the other in its performance, on the alleged ground that he was induced to enter into the agreement by the false and fraudulent representations of the defendant. In 1887 the indebtedness of the city of Hous-

ton, Tex., was about $1,700,000, of which upwards of $1,000,000 had been the subject of controversy; and suits had been brought by Fazende & Seixas, of New Orleans, and others, against the city, in the federal and state courts, to compel it to levy taxes and pay the overdue sums upon its bonds. The plaintiff, holding upwards of $70,000 of the indebtedness of the city, consisting of bonds, coupons, and judgments, entered into the agreement of April 14, 1888, with the defendant, whereby, after reciting that an agreement to compromise the present defaulted indebtedness of the city of Houston had been made, and that the plaintiff was then owner of about $72,000 of the indebtedness, it was agreed that the plaintiff sell, and accept from the defendant 80 cents on the dollar in cash for, $20,000 consolidated bonds of the city, and accrued interest thereon to July 1, 1888 (in all, amounting to $20,600), delivery to be made at any time prior to that day; that the plaintiff also accept the new compromise bonds of the city in exchange for $10,000 of market-house bonds, and accept, in exchange for the balance of the indebtedness owned by him (bonds, judgments, and past-due coupons not barred by the statute of limitations), new 5 per cent. bonds of the city of Houston; that the plaintiff deposit with the defendant $7,000 coupons, to be held by him until the terms of this agreement are complied with. That defendant agreed to take such bonds and other evidence of indebtedness, and pay for them in that manner. And it was further mutually agreed that interest be allowed on the indebtedness in conformity with the compromise between bondholders of that city in the same manner as allowed to Messrs. Coler & Co.; that the loans of $19,000, against which the evidences of such indebtedness were held, might be paid, and they be taken up by the defendant and held by him as security for the advances so made, and that if, for any cause, the compromise between the city and certain of its bondholders thereinbefore referred to should not be effected, this agreement should be considered null and void, and the $20,000 bonds should be returned to the plaintiff, who should then return to the defendant the amount paid by him, on the basis of 80 cents on the dollar. The false and fraudulent representations alleged to have been made by the defendant were to the effect that a legal, binding agreement had been made by and between the city of Houston and Fazende & Seixas, holders of its bonds and defaulted indebtedness, to compromise the entire then existing defaulted indebtedness of the city; that, unless the plaintiff joined with them in the arrangement, the agreement could not be carried out, the compromise would fall through, and the plaintiff would be a loser; that, relying upon a certain alleged option which he claimed had been given him by the plaintiff, he (the defendant) had, through Fazende & Seixas, entered into a binding agreement with the city of Houston to deliver them the securities of the plaintiff referred to in the option; that, under such agreement between the city of Houston and Fazende & Seixas, the defaulted bonds and indebtedness of the city were to be retired by the bonds bearing 5 per cent. interest, and that no persons holding any of them were to receive

bonds bearing any greater rate of interest than that, under the agreement of compromise, except Fazende & Seixas, who, for certain reasons stated, were to receive 6 per cent. bonds in exchange for the bonds and indebtedness of the city which they owned; and that the defendant was getting nothing, and no compensation or profit, out of the transaction, but that his sole inducement to negotiate with the plaintiff was to facilitate the carrying out of the agreement so made between the city and Fazende & Seixas. The plaintiff also alleges the falsity of the representations, and their inducement to him to enter into the agreement made with the defendant; also, other matters, with a view to the relief sought. He gives evidence tending to prove that such representations were made to him by the defendant mainly through one Duncan Cameron, and much evidence is introduced by the parties upon the subject to which they relate. It appears that Fazende & Seixas held a large amount of the bonds and indebtedness, and had been the leading persons in the prosecution of the actions against the city founded upon its default in payment of its bonds, arising out of its failure to pay its bonds or matured coupons, or both. The city was defeated in its defense. With a view to some arrangement with the holders of the bonds and indebtedness, the mayor was authorized by the city council to appoint a committee to negotiate and agree with the creditors of the city as to the terms and conditions upon which a settlement of the debt of the city could be effected. The committee was appointed, and after some correspondence the committee met Mr. Seixas at New Orleans, had negotiations with him, and received his proposition; and, on returning to Houston, the committee made report to the city council, recommending the adoption of such proposition. It was accepted, and Fazende & Seixas were so advised; and thereafter, and on April 7, 1888, an ordinance was passed by the city council accordingly, pursuant to authority conferred by the provisions of an act of the legislature of the state of Texas entitled "An act concerning debts of towns and cities," and known as "Chapter 72 of Laws 1887." By this ordinance it was provided that all holders of valid bonds and coupons of the city, and of judgments against it (with certain exceptions), should have the right to accept the provisions of the ordinance; to exchange their bonds, coupons, and judgments, with interest and costs accrued to July 1, 1888, for the bonds to be issued, bearing that date, having 30 years to run. And it provided for the issue of bonds to the amount of $500,000, bearing interest at the rate of 6 per cent. per annum, and for the further sum of $600,000, bearing interest at the rate of 5 per cent. per annum. Because a provision of the ordinance imposed certain duties upon the comptroller of the state, which he would not accept, another ordinance, omitting such provision, and in other respects substantially the same as the former, was made, of date June 2, 1888. The alleged representations upon which the plaintiff mainly relied were that Fazende & Seixas had entered into an agreement with the city for the compromise of its entire indebtedness, and that the compromise was limited to 5 per cent. bonds, with the ex-

ception of the bonds and other indebtedness owned by Fazende & Seixas, and therefore he would be unable to obtain, under the arrangement, bonds of any greater rate of interest than 5 per cent. There is some conflict in the evidence as to the oral agreement between that firm and the settlement committee, and the understanding of the city council as to what Fazende & Seixas promised to do. There is, however, much evidence to the effect that they did not undertake that the entire indebtedness in view should be funded under the ordinance, but that their influence would be used to that end, and their suits discontinued. They held about $360,000 of such indebtedness, and they represented Messrs. Coler & Co., who held about $350,000, and by arrangement between them the latter had consented to take 5 per cent. bonds. There is evidence to the effect that in the arrangement made by Fazende & Seixas with the committee, and approved by the city council, it was understood that they might exchange $400,000 of the city indebtedness for 6 per cent. bonds. It seems that Mr. Seixas was in Houston city at the time the ordinance of April 7, 1888, was adopted. And there is some evidence to the effect that he contemplated having, through the defendant, the plaintiff's bonds and his other securities against the city. He had before then had some communication with the defendant on the subject, and had been advised of the option mentioned in the complaint, and which will be hereafter referred to. It is clear that there was an amount exceeding $300,000 of the city indebtedness within the purpose of the refunding scheme that Fazende & Seixas had no reason to suppose was under their control. And although it was substantially stated by Seixas in his letter of December, 1887, to the chairman of the settlement committee, and recited in the resolution of the city council of March, 1888, that his firm owned and controlled almost the entire unsettled indebtedness of the city, this did not appear in the written report made by the committee; and the conclusion is warranted by the evidence that there was no understanding in the arrangement made by the committee with him that his firm would have under its control exceeding $400,000 of the amount, exclusive of the holdings of Coler & Co. After Fazende & Seixas had succeeded in the mandamus suit in the federal court against the city, they sought to obtain as much of the indebtedness as they could. The market value of the bonds up to that time had been about 60 per cent. They obtained some through the defendant, who was acting with and for them. They suggested that he obtain an option from the plaintiff, which he, through Cameron, sought to do. On March 24, 1888, the plaintiff delivered to Cameron his letter to the effect that he was willing to give an option of six months on all of his Houston city indebtedness (bonds, coupons, judgments, and interest) at 82 cents on the dollar, in consideration of $100. This was delivered by Cameron to the defendant, who, it appears, wrote and signed "Accepted" across the face of it. Later in the day the plaintiff saw in a New York newspaper the announcement that the Voorhies case was decided against the city of Houston, whereby it was determined by the

state court of Texas that the constitutional limitation upon which the city had relied to relieve itself from the levy of taxes to pay the bonds was not applicable to them. Voorhies v. Mayor, etc., 70 Tex. 331, 7 S. W. 679. The plaintiff was familiar with that case. He thereupon called upon Cameron, and told him that he withdrew the option. A controversy arose between them, whether he could thus relieve himself from the option. More or less talk was had between them until April 14th, when the agreement in question was made between the plaintiff and defendant; and what took place in the negotiation and was the inducing cause of the result were subjects about which the testimony of the plaintiff, on the one hand, and the defendant and Cameron, on the other, was conflicting. That of the defendant and Cameron was to the effect that the latter never had any authority from the defendant to negotiate for any contract for the purchase of any of the plaintiff's bonds, coupons, or judgments; that he was employed as a broker to obtain an option from the plaintiff, and nothing more. Cameron testified that he had no negotiation whatever with the plaintiff about making the sale or the agreement, and made none of the alleged representations to him, but that, being annoyed by the action of the plaintiff in seeking to avoid the effect of his option, he, on the day of the date of the agreement, brought the parties together in the office of the defendant to fix the matter up in some way, and, leaving them there, was not present when the negotiation was had which resulted there in the agreement. The defendant, by his testimony, specifically denied that he had made to the plaintiff any of the statements alleged by the plaintiff, and upon which he relies to support his charge that the execution of the agreement was procured by fraudulent means. He says this was the first time he had any talk with the plaintiff about the option; that he then said to him that he would hold him to it, and, on the statement of the plaintiff that he thought he could not, added that he could sue him, etc.; that the plaintiff then said he did not want to give an option, wanted to raise some money, and that, if he could make some other arrangement by which he could get some cash on those things, they probably could make one; that then they proceeded to the terms of the agreement, and it was drawn and executed. As bearing upon the question of the alleged fraud, and another question of fact, it may be observed that as early as April 5, 1888, the plaintiff was advised, by a Houston city newspaper which he had, of the action of the settlement committee, their report, and the resolution thereupon passed by the city council on March 8th; and on the day his agreement was made with defendant, and after it was executed, the plaintiff received a letter from one Charles Tinsley, his correspondent at Houston city, and, although the letter was not produced upon the trial, it may reasonably be inferred from the evidence of the plaintiff that it conveyed to him information of what had taken place in regard to the refunding scheme. And some knowledge of the plaintiff on the subject is also indicated by his letter of date April 14, 1888, to Mr. Tinsley, of that city, in which he refers to the purpose

to let Seixas have 6 per cent. bonds, and says he does not think it just that Seixas and Jemison should put other people's bonds in on 6 per cent. basis. On April 17th the plaintiff delivered to the defendant the balance ($3,000) of the coupons referred to in the agreement, and on May 8th delivered to him the $20,000 of bonds therein mentioned, for which the defendant then paid him. The plaintiff afterwards, in November, 1888, refused to deliver to the defendant the residue of the bonds, coupons, and judgments. The reason given for this refusal was that, from information received by him, he believed that no agreement had been made between the city of Houston and certain bondholders to compromise the whole debt, as represented to him, and that in the event such arrangement should not be carried into effect the agreement was deemed null and void. The matter of this refusal has no relevancy in the present case, and the reason given for it has only such importance as it bears upon the charge on which the action is founded. The reason so stated is involved in the questions of fact to which attention has already been directed. In view of the fact as found by the trial court, and of its support by the evidence, it may be assumed that no agreement was made by Fazende & Seixas with the city requiring all the holders of its indebtedness within the purpose of the compromise to accept its terms and take the bonds. It would have been an undertaking quite unreasonable for them to enter into. They did, however, make with the city an agreement, consummated by the ordinance, which permitted all such creditors to exchange their holdings for bonds. Without the aid of the alleged fraudulent representations, the agreement of the parties cannot be deemed as nullified by force of the provision of its last clause. It does not in terms provide that, for the compromise to "be effected," it is essential that all such creditors of the city avail themselves of it. What the agreement of the city with certain bondholders was, appears by the evidence. That it was effective, also appears; and that the compromise was effected by them and many others likewise appears. It is with much force urged by the learned counsel for the plaintiff that the court erred in the findings to the effect that the defendant did not represent to the plaintiff that no person holding the city bonds or indebtedness was to receive bonds bearing a greater rate of interest than 5 per cent., under an agreement of compromise, except the firm of Fazende & Seixas, who, in consideration, etc., were to receive 6 per cent. bonds in exchange for bonds which they owned, and that under such compromise the plaintiff's bonds could not be exchanged for 6 per cent. bonds of the new issue. The ordinance itself observed no distinction of the city creditors holding its indebtedness, within the purpose of the compromise. The understanding by which the right of that firm to take 6 per cent. bonds was within the agreement which resulted in the ordinance, and it is likely that others who could not be induced to take the 5's in exchange would be given the 6's while they lasted. The parties were brokers, and each of them undoubtedly was disposed to realize what he could legitimately; and therefore it may be reasonable to suppose that if the plaintiff knew when he made the agreement with the defendant that he could get 6's for the residue of his bonds, coupons, and judgments, he would not have agreed to take 5's for them, unless his desire to receive the money for the $20,000 of his bonds was such as to induce him to take the 5's for such residue. But this is not important, except so far as it bears upon the question whether the alleged representations negatived by the findings of the court were made to him by the defendant for the purpose of obtaining the execution by him of the agreement. The only direct evidence that such representations were made to him is that of the plaintiff himself. And, in view of his relation to and interest in the controversy, his evidence alone, if uncontradicted, might not necessarily require a conclusion in accordance with it. Honegger v. Wettstein, 94 N. Y. 252. Nor did the statement made by Seixas, in his communications to others, as to who were and who were not to have the 6's, and to the effect that the plaintiff's bonds were to be exchanged for 5's, necessarily support the evidence of the plaintiff, although, in view of the relation of Seixas to the defendant in the business, they may have been entitled to some consideration, bearing upon the understanding and purpose of the defendant. The effect of Cameron's testimony is that he made no such representations to the plaintiff, as he says that he had no negotiation with the plaintiff for the purchase made of his bonds, and was not present when it was had between the parties; that when he returned to their presence the terms had been agreed upon, and the execution of the agreement was then witnessed by him. And he testified that he did not tell the plaintiff that his bonds would go in for 5 per cent. bonds. Meldrum, who was present at the negotiation between the parties, also testified that nothing was then said by the defendant to that effect, and the evidence of the defendant was that he did not know of the agreement between Fazende & Seixas and Coler that the former should have 6's; that there was no discussion between him and plaintiff as to the amount of bonds, whether 5's or 6's, that he was to get, although he was hoping to get 6's; and that the plaintiff did not ask him what he was going to get for his bonds, whether 5's or 6's. Whatever view of the fact may have been permitted by the evidence, the court was not required by it to find that such representations were made by the defendant to the plaintiff. The same may be said of the other findings of the court on the subject of representations alleged to have been made, and a like remark is properly applicable to the propositions of fact which the court was requested, and refused, to find. All the questions arising upon the trial for the determination of both alleged propositions were those of fact, and, while the evidence was somewhat conflicting, it is not seen that the conclusions reached by the trial court were against the weight of evidence. None of the plaintiff's exceptions were well taken. The judgment should be affirmed. All concur, except CULLEN, J., not sitting.